Good morning. May it please the court, Court Michelle, I'm Ashley Michelle on behalf of Appellant Quad Graphics, Inc. I respectfully request a reservation for three minutes. The equitable and mootness doctrine is a judgment document that is supposed to be a very limited and narrow exception to the court's virtually unflagging obligation to exercise their jurisdiction. I'm with you, I agree with then-judge Lito, but the problem is that seven of our then-colleagues disagreed with our position. So what do we do given the fact that we've got Inre Continental sitting out there? Well, there's a number of things the court can do. First of all, in Continental, when this court adopted the doctrine in a very narrow on-bank decision, the court never considered whether or not it was consistent with or authorized under the statutory jurisdictional provisions governing the bankruptcy court, specifically Sections 28 U.S.C. 157 and 28 U.S.C. 158. Those provisions require that any bankruptcy court final order that's entered be subject to appellate jurisdiction. It's true it wasn't challenged on that basis, but Continental Airlines itself talked about it involving the discretionary balancing of equitable and prudential factors rather than the limits of federal court's authority under Article III, which indicates that the majority had given at least some thought to it, even though it wasn't raised and argued in those terms. So how short of on-bank reconsideration can we take issue with the viability of the doctrine in this circuit? Well, there's another number of options. First of all, to the extent that the court did determine that it wanted to use the verb overrule, and overrule Continental, it could sui fonte order a rehearing on-bank in this case to consider that. But short of overruling, especially a ruling Continental, the court can limit, modify, clarify, and do all sorts of things short of overruling it. Oh, you say all sorts of things. I'm visualizing 11 colleagues who may not share your view of the permanence of an on-bank decision. Well, for example, one of the legal issues that the Third Circuit has not cited is does Section 28 U.S.C. 157 and 158, and also Article III of the Constitution, require that a bankruptcy court's decision on a confirmation order be subject to appeal? So when you make that argument, I understand obviously you're raising a constitutional argument as to Article III jurisdiction. In making the argument, as you do here in your briefs on the statute, are you arguing that there's a statutory mandate for jurisdiction, or is that sort of a permutation of your constitutional argument that it's a violation of separation of powers for the court to use this judicially created doctrine given the language of the statute? There's two distinct issues here, and I think they were illustrated well in Sturmey Marshall. There's the statutory authority of the bankruptcy court to make decisions and act, and then there's the constitutional restrictions of Article III. Under the statute, Congress has decided the bankruptcy court can enter final orders and judgments in confirmation proceedings subject to review by the district court. So the authority vested in the bankruptcy court by Congress is limited by that review provision. If you take away the review, you take away the bankruptcy court's authority because it is conditioned upon that. So the Congress has determined that the authority that they've given to the bankruptcy court, and keeping in mind that this is a very fragile jurisdictional grant that they've done, is subject to that. That's statutory constraints. Then you have the constitutional constraints. In Sturmey, the court actually found that although the statute allowed the bankruptcy court to make decisions in Sturmey-type cases, the Article III constitutional provisions did not allow it. So there are two separate issues. The constitutional issue is that parties have a right to review by an Article III court. You're talking about substantial rights there. My client had the single largest claim in this case of $10 million. That claim was wiped out in confirmation. We raised substantial objections to confirmation. We have the right to have that reviewed, the bankruptcy court's determination, by the district court. Otherwise, as Justice Alito warned, it essentially becomes a per se rule. If you don't have a stay pending appeal, the way the test works is you can't seek to overturn the whole confirmation order. You can parcel out pieces of it, but you really will never get Article III review of the entire order, because that's not the way the test works. Can you address, you mentioned Stern, obviously, but you also made reference to the virtually unflagging obligation of the courts to exercise jurisdiction. Besides Stern, what, if any, intervening developments or cases do you have in mind, either from the Supreme Court or perhaps our own circuit's experience, having tried to cabin this doctrine to exceptional circumstances that would warrant reconsideration on Muck? Well, not only did the Supreme Court issue a decision sternly in Marshall, they recently issued another decision in the Executive Benefits. And I think what's important about that decision, and this court has said in Marr v. Belitsky, 719S3-160, 2013, that this court must look at VISTA by the Supreme Court. The Supreme Court does not have the capacity to review every decision that comes before it. So they pick and choose cases, and this court recognizes it's important to look at the cases that the Supreme Court hears and read between the lines and look at VISTA and see where the court is going in order to facilitate the resolution of things like this. And I think what's important about the Executive Benefits Insurance Agency decision is two things. First of all, it talks about the argument of a gap in the code. In that case, the courts found that when you have this stern issue, because it doesn't fit within the core proceedings anymore, you can't adjudicate another gap, and it's not specifically a non-core, they said there's a gap in the code. The Supreme Court rejected that and said there's no gap here. There's a saving clause in the statute, and to the extent that it doesn't fit in the core proceedings anymore because we've deemed it can't, you adjudicate it under the non-core proceedings. I think that's telling because the equitable mootness doctrine is based upon a so-called gap that the courts have perceived in the bankruptcy code under Section 363 and 364, both of which are congressionally enacted statutory mootness provisions. If you don't get a state pending appeal under 363 or under 364, your appeal rights are distinguished. That was created by Congress. Congress chose to do that. Courts looking at confirmation and not seeing a similar provision perceived that as a gap. There is no gap. The legislation chose which provisions to require it and which not to. The statute's clear. Where Congress chooses not to speak on something, the implication is, and they have spoken on it in other contexts, the implication is that they did it purposely. So there is no gap, and I think the Supreme Court was indicating that in the executive benefit, that if you're going to find a gap in the statute, it better be pretty clear because here I don't see a gap, and I don't think the Supreme Court would see a gap as it did in the executive benefit. They also said in the executive benefit that they've heard in that decision because essentially at the end of the day, the party got what they wanted, which was review by an articles-free court. So the court said effectively, look, you might have not gotten it procedurally the way you wanted, but you did get articles-free review, and that's what the court emphasized, emphasized that the statute, 157 and 158, require review by an articles-free court, and I think the Supreme Court was essentially tipping their hand saying, look, this is what the statute says, and we're following the statute. The statute requires articles-free review. When it comes and to what extent might vary whether it's a CERN case or a non-CERN case, and in a CERN case, there's full de novo review of both the factual findings and the legal conclusions, versus a non-CERN case, the court proceeding, it's de novo review of the legal issues and clearly erroneous on the factual issues. Sure, and obviously this is an equitable mootness case. Is there any case you can point us to that holds that article-free review is required of a confirmation plan? I can't point to a case, but the statute clearly says that it is. I'm going to say clearly. You can read the statute that way. I'm not sure the statute says it so clearly that it would necessarily negate the possibility of equitable mootness. Well, the statute says, specifically says that a bankruptcy court can enter final orders, and I don't have the language right here in front of me, subject to the Section 28 U.S.C. 158. How do you answer? I'm sorry, Section 28 U.S.C. 158 provides for appellate review. So the statute is plain on its face. I don't think there's any case that says the statute doesn't plainly say that. How do you then answer Mr. Serota's point that the statute also in 1334 C.I. provides that a district court can abstain from particular proceedings, quote, in the interest of justice, close quote? What does that cover? Absolutely. The court has specific extension provisions, and they talk about exactly what kind of proceedings the court can abstain. And there is a catch-all phrase, in the interest of justice. But to argue that denying the right to appeal a confirmation order, per se, if there's no say, is in the interest of justice, I don't know what interest that is. I mean, finality, certainly, is in the articulated interest that the court is trying to promote. And finality, certainly, I have represented debtors in the past trying to, you know, deal with that issue. It is an issue. And I'm not saying that finality is not an issue. I'm just saying who is the proper body to deal with it? Is it the court? Is it Congress? Is it the parties themselves to try and arrange for some negotiation, interim provisional remedies pending an appeal? Who is the proper body to address that issue and how to address it? In other words, is Quackenbush broad enough to encompass those situations where the court is allowed to abstain? Is that broad enough to encompass this doctrine? And if not, why not? Quackenbush abstention. Most abstention doctrines are based upon the idea of the sovereigns and the fact that there's another forum. And it's an exercise of jurisdiction in usually in the original sentence in the sense that the court abstains and decides they're not going to hear the case at all. And then it's better heard in the state court or it's better heard somewhere else, even in bankruptcy. Most of the abstention provisions that are codified deal with the fact that there's either state court issues that predominate and the court case should be either remanded if it's been removed to bankruptcy court or that there's a better forum to adjudicate those issues. We're not talking about that type of abstention here. We're talking about the federal courts have exercised jurisdiction over the case. They've ruled on the merits. They've entered a decision. This is the appeal from that. This language in Quackenbush, that's what I was referring to, where it talks about allowing for abstention in situations, and they do talk about federal, state, and comity. Then they also say, for example, abstention is warranted for comity or a rise judicial administration. If we have a situation where the planned sponsor may walk away, and it's kind of a catch-22, I admit, but if there's a determination that there's a substantial risk the planned sponsor will walk away and that the bankruptcy confirmation will be undone, why wouldn't equitable action here fit within the language of abstaining for the purposes of wise judicial administration? Because it's not wise judicial administration to deny the fundamental right of a party to appeal. This is a case where the bankruptcy court made numerous, numerous factual and legal errors and initially didn't even confirm the plan, made the parties come back and make the modifications to fit it in, try and fit it into the code. There were so many violations of the code here. Certainly she's not going to grant us a state pending appeal and say that she was wrong on the merits. I never require that. And then we go to the district court, and the district court, on considering our stay application, picked and chose the issues that he actually addressed, and he really didn't address most of the legal errors that we argued, and denied the stay. And then we next move on, as in most cases, to the equitable mootness, and by then it's too late. By then the court says, well, if you want to overturn the plan, you can't. How is that ever judicial efficiency at the risk of appellate's right to appeal those decisions? Essentially it lets the bankruptcy court be able to confirm a plan over the strenuous objections of parties and then just have it get rubber-stamped through the system. And most plans now contain the condition precedent to the effectiveness of the plan. One of those standard boilerplate conditions is that the order be final. I think my time is up. No, believe me, it's not up. Unless you want it to be. No. One of the conditions precedents is standard in most plans I've seen lately, is that the confirmation order be a final order, meaning no more appeals, time has elapsed, no appeals pending. That condition precedent is waived by the people who are in control, the debtor, the plan sponsor, the committee, whoever is controlling the negotiation of the plan. They have the option to waive that. If they waive it, they waive it at their peril. That should not be harmful. My client should not be harmed because the plan sponsor in this case chose to waive that condition and proceed at its peril. How is it equitable to then turn around and deny my client the appeal right because the plan sponsor chose to proceed? I'd like to talk about the application of the doctrine and the errors from your standpoint that the district court made. It seems that your argument is there's such a stark contrast between cases where the doctrine is normally applicable and this case. Does our inquiry end as simply as if we find that this wasn't a complex reorganization, then it doesn't apply, or is the argument more focused on, look, none of the five factors really militate in their favor, and this was just wrong on every level? Well, the first part of the question, should you stop at that this was not a complex case? The court has indicated that the narrow exception should only apply in complex cases. We argue that this was actually a requirement that the court imposes, that it has said this only applies in complex cases with intricate plans that need to be unraveled. Which of the five factors does that fit into? It's stated in the opinions. It's not stated as one of the factors in the test, and that's what the district court ruled. The district court said it's not one of the factors, so I'm not going to consider it. I think it does factor into the consideration of whether or not you can reverse undo the plan. But the reality is when you look at the factors, the factors that parties always get hung up on, including my client, is are you seeking to unravel the plan? Are you seeking to undo the entire confirmation? And, in fact, my client is, and isn't that their right? We also have a separate request for relief, which is to strike certain releases, because the court has been inclined in the past to parse through confirmation and take out pieces that won't affect the entire plan. But that's really the problem. When you go through the factors and you look at reliance by third parties, in this case there's no reliance by third parties on the actual plan. There were ordinary course transactions entered into after they claimed confirmation, such as hiring people and things like that, but that's just ordinary business transactions. That's not like issuing stock under a plan and selling it on the stock exchange and third parties coming and buying stock issued under a plan. They really could not point to third parties that had relied on this plan. Is it your position that there is some different plan of reorganization that might be forged, or is it that the solution here should be converted to Chapter 7 bankruptcy? We had two issues. One was we thought that the liquidation value was greater than what our client was going to receive under the plan, for two reasons. One, because we thought the assets were undervalued. Two, there were significant releases, releasing third parties, insiders, that we thought had value. We put on expert testimony about the value. The bankruptcy court rejected our evaluation. We thought that those had value, and we thought that if the case was liquidated and those actions were pursued, that creditors would get more. And keep in mind, my client is about 90% of the pot of creditors. If we're talking about Chapter 7, then would it be necessary to retract the distributions that have been made? Yes and no. No to the extent that some of the distributions were made on admin claims, administrative claims, so it had to be paid anyway. The amount of distributions that have actually been made to unsecured creditors, again, my client is approximately 90% of the pool, so the amount is not significant dollar-wise, and most of the people who have received distributions, other than my client, still do business with the debtor, so they could easily just set it off against amounts due, but it's not a significant amount. There were not a lot of creditors in this case, and not a lot of creditors owed a lot of money. This is really about the releases to the seeming third parties who you're claiming are insiders, who basically, from your client's standpoint, got away with murder. They essentially got releases, and, in fact, Judge Winfield erred when she upheld the releases. She did not consider all the factors required to approve them. Specifically, she did not consider whether there was consideration for those releases, and, in fact, there were not. There were some claims released that one of the parties was releasing certain claims against the estate, but those claims were, in our opinion, not inflated. We didn't object to them because there was really no purpose since they were being released, but there really was no consideration. In fact, Judge Winfield never, ever found that there was consideration for the releases, which is one of the legal errors that we alleged below. That's a requirement. In addition to liquidation, we also had an issue with the sale. We would have fully supported a sale that we thought was marketed, that complied with LaSalle and the absolute priority rule, but, in this case, it was a sale to somebody they found. There was another offer that they claimed they never saw. In writing to counsel for the debtor, the debtor claimed that they never saw it, but there was no 363 sale. There was no auction. There was no advertising. There was not sufficient marketing to maximize the value of the estate. It was a plan proposed by the debtor during exclusivity. Exclusivity was never opened up, and this was a buyer handpicked by the debtor. Originally, they had proposed a plan where the principal's wife, I shouldn't say the principal, the president of the company, CEO's wife, who was a member of the company that was the holder of the company, was going to buy back her interest for $100,000. The court did not confirm that plan because she found that it did not comply with the absolute priority rule because the new value was insufficient. So, instead, they went out and found another purchaser who paid $200,000. But given that it's a third party and that it appears to be an arm's length transaction, what is the basis for your absolute priority rule claim at this point? Because prior to even bringing in that new purchaser, the debtor had drafted and proposed a new plan, and under the new plan, essentially, it laid out the price. It says $200,000. It laid out all the terms, including lucrative employment contracts for Mrs. Heverly. And that was before they even had the plan sponsor. Then they identified a plan sponsor, brought the plan sponsor in, who basically complied with the terms that Mr. Heverly imposed upon him. The only change was instead of Mrs. Heverly being paid $300,000 a year as president of the company working from her marital home, they allocated a salary between Mr. Heverly and Mrs. Heverly. But essentially, our argument with the absolute priority rule was they're retaining property under this plan on account of their equity interest. They dictated what the terms of the sale would be. Long before they even brought in the plan sponsor. They were the ones who established the terms. They were the ones who controlled the process. And they were the ones who reaped substantial benefits under this because of their equity interest. And even though they didn't retain equity, that's not what the absolute priority rule said. It said you can't retain any property under the plan unless unsecured creditors are paid in full. So, going back to this problem here, you, representing your client, have been meticulous in taking every step, dotting every I, crossing every T to protect your client's rights, asking for a stay, doing the denial of a stay. What would happen in this case if your client had been represented by a lawyer where the confirmation plan had been approved and there's been no attempt whatsoever to hold off, to have the article be taken forward, take a look at that, and then the same situation occurs and the district court takes a look at it and says, well, you know, it's been whatever it is, two or three years, and if I unscrew this, if I put the toothpaste back in the tube, the plan sponsor's going to walk away. The person who's challenging this really did not protect their rights. I'm going to simply abstain and let the confirmation plan go into place. What would be wrong with that? It sounds like a latches defense. What would be wrong with that? I think what you're saying is there's nothing wrong with it. I think it's consistent with the reason behind the doctrine, the purpose. Why is it the same jurisdictional issue? Because, well, the jurisdictional issue, aside from that, you were talking about, I apologize, I thought you meant on the equitable movement basis. Right. The purpose of the doctrine, and I'm quoting from Nordrup, was to prevent a court from unscrambling complex bankruptcy reorganizations when the appealing party should have acted before the plan became extremely difficult to retract. Right. But if it's a jurisdictional issue, that last factor should be irrelevant. That's why I worded my hypothetical the way I did it. If we either have jurisdiction or not, we have an article of equity that has jurisdiction or doesn't have jurisdiction. If the jurisdiction turns on what is tantamount to a latches defense, how fastidious the objection party has been in trying to build in a stay of the status quo, if you will, and so an Article III court can look at it, that's what it turns on. That does not arise out of the language of any of the bankruptcy code or of the Article III. I'm trying to figure out, in terms of the equitable mootness, how you rationalize that decision. Does that make sense, that question? I understand what you're saying, Your Honor. And I think that perhaps put another way, is there anything in terms of the procedure, any deadlines that are imposed by statute in terms of a right to appeal that might be relevant? Perhaps you can address that, too, in your answer. I think that there's two issues. If the court is going to continue to, if the equitable mootness doctrine is going to continue to survive, I think it should be put back to its original purpose, which was to recognize the inequity of a party sitting on its rights, failing to seek a stay while the debtor goes out and consummates the plan, and then wanting to appeal. Right, I'm with you there, but how do we do it? That's, to me, the limitation. Where does that limitation come from? That comes from the court. It was a judge-made doctrine, and that's how it was originally formulated. What happened was, as parties realized that they had to seek a stay or be subject to it, they started to seek a stay, as my client did. Once you seek a stay, I don't think the equitable mootness doctrine should even come into play. But if it's a judge-made doctrine that you're conceding is valid in some circumstances and not others, I'm trying to tie that to some analysis, some analytical framework where it would be consistent. I don't think it's statutorily or constitutionally permitted even in that context. Okay, that's what I'm trying to get at. I don't think it has a valid basis under the statute, under the Constitution, under any basis. But if I'm looking at the worst-case scenario that the court's equitable mootness is here to stay, I think it needs to be set back to what it originally was, which was a narrow exception. How would we do that? How would we do that? I would limit it to parties who fail to seek a stay. Because that's the equitable consideration that started it all off. Equity says if you sit on your rights and don't seek a stay, well, that should factor into whether or not you should be able to go forward on this appeal. Okay, but, again, that doesn't come out of 1557. Where does that come from? I'm trying to get at the guts of the origins to this thing. In one situation, the hypothetical I put there, it makes perfect sense. In your situation, that seems to me exactly what Judge Alito was talking about in the dissent in McContinental. It doesn't make an awful lot of sense. It is a catch-22, and the five- or six-point analysis that you look to, it really all boils down to was this stay imposed? Because once a stay is imposed, then all the other factors fall into line. It's a five-part test that boils down to one factor. That's one of the reasons I'm troubled by it. But in trying to look at this thing doctrinarily, in a situation where equity does not work in favor of the person who's objecting, it seems to me the same analysis and approach should apply, and I'm having trouble trying to figure out how I would do that. Because the jurisdiction, again, it's either there or it isn't there. And the latch, maybe this is the answer. If latches is the basis for saying we're not going to undo this plan, and the district court or the third circuit court says that, it's exercising jurisdiction. It's not abstaining. It's simply exercising jurisdiction and dismissing the appeal based upon the doctrine of latches, which is different from saying we're not going to accept this confirmation and we're going to abstain. Those results are the same. But in one sense, it is an exercise of jurisdiction. You're just relying upon latches. And it doesn't make sense, because if a party sits on their rights and doesn't take a stay that they have the right to do, then that's an equitable consideration. But in a case like this, where we did everything we could, we even sought injunctive relief after we were denied a stay, arguing that the court should enjoin certain acts that might equitably move the appeal. How is that different in principle than the equitable mootness doctrine as it was described in Continental? Because the court said explicitly that it was viewing the doctrine as a prudential one and discretionary one and not something that related to the limits of Article III jurisdiction. I'm not sure I understand your question. I'm going to pause. I just froze. Well, I guess I'm trying to understand what the distinction would be if you don't object to the concept of taking jurisdiction, but on a prudential basis with a doctrine like latches not reaching the merits. Isn't that what the court in Continental Airlines said that the equitable mootness doctrine was, a similar kind of prudential doctrine rather than an abstention doctrine, rather than truly a jurisdictional abstention? To the extent they said that in Continental, in practice it has not been applied that way. This is a perfect example. We exercised all our rights to seek a stay. We appealed those denials, but when we got to the district court on the equitable mootness, one of the primary questions was, are you seeking to undo the plan? And we are. And the way, you know, is it a prudential consideration to say if you're appealing and you haven't gotten a stay, you cannot appeal the confirmation order. Because that's the first day rule now. It's become a first day rule based upon the test. If you seek to overturn the confirmation and send them back into bankruptcy, you have no appeal right. I don't see how that really adopts any prudential consideration. I mean, that's denying appeal rights. It's exactly the same now. It operates as 363 and 364 do. The doctrine in practice now operates that way. And the debtor and sponsors and investors have significant control at the mercy of the creditors to make that happen. They can put the condition precedent in the plan. Then once they see what happens at confirmation, they can decide what their odds are of prevailing on equitable mootness, irrespective of the odds of prevailing on appeal, and weigh that and determine whether or not they're going to weigh that condition precedent and go forward with the plan. Or if they're worried that maybe there won't be equitable moot, then they can decide to wait. So it's all within their control. And why should the doctrine be so uncertain? Why should parties have to sit and determine, okay, should we go forward or not? Is it going to be equitably moot? Isn't the whole purpose of the doctrine finality? I mean, how does that foster finality to have parties kind of betting on whether or not the appeal is going to be equitably moot and whether they should go forward? It's gray. I mean, the test, unfortunately, has become a per se rule, but for things like the releases, it's very gray when you're trying to counsel a client whether or not that's going to be stricken as equitably moot or whether you're going to be able to go forward or not. It's not a policy that furthers the purpose I think it was designed for, which is the problem with finality and plans. How does a big corporation implement a plan pending an appeal? I mean, there's a problem. And the question is, how do you resolve it? And our position is equitable mootness. Not only is it not the correct solution because it doesn't work, but it's not found in the Constitution and it's not found in the statutory jurisdiction provisions for bankruptcy. There's other solutions. You can, the court has authority to promulgate rules. You can do expedited procedures for appeals of confirmation orders. You can do partial appeals, de novo, of the legal issues raised during confirmation. You can do interlocutory appeals of legal issues being raised at confirmation, make the parties identify them up front, have the court rule on the legal issues and the summary judgment matter before confirmation and have that appeal pending while the confirmation hearing is going forward. You can determine that- Let me start. I'll take your word for it. There's a lot of different- You say it sometime I think, but we'll hear from you again. May I ask something to consider for rebuttal and something I'd be interested in hearing from Mr. Sirota as well. If the court were even open to reconsidering the doctrine but concluded on the fact here that there was an abuse of discretion, does the doctrine of what's sometimes called constitutional avoidance or final rule, does that require that we address the matter as an abuse of discretion or since we're not dealing with something like statutory construction or principles of comedy or federalism, that we could still address the constitutional challenge that you've raised? And again, if you want to address that on rebuttal, feel free to do so. Okay, thank you. Good afternoon, Your Honors. Michael Sirota calls shots on behalf of One for One Communications. The district court did not abuse its discretion and most respectfully this court should affirm the district court's ruling. The district court relied on 18 years of precedent starting with an in-bond decision of this court as well as- 18 years of precedent. It would appear in analyzing the factual scenario here that the type of bankruptcy that we have here is not the type that is generally considered a complex reorganization and might not fall into the category of cases that have been analyzed over those 18 years since Continental. So tell me if you would why a case that at least seemingly is very distinct in size and complexity clearly from Continental, but Continental's prodigy as well. Progeny, I'm sorry. Yes, Judge. It is true, Your Honor, that the equitable mootness doctrine appears most frequently in the context of large, complicated Chapter 11s. Large being defined by complexity, issuance of public securities, as well as, you know, big dollars. But there's nothing in any of those decisions that say the doctrine shouldn't be applied in situations where third parties, investors, creditors, and others rely on the confirmation order and would be harmed. When is that not the case? It's not the case in several decisions of this circuit. No, no. I'm sorry. I didn't articulate my question well. When is it not the case that third parties would be relying upon agreements that have been reached? You can have a situation, Judge, where a plan of reorganization is based predominantly on a commitment to pay in the future, that there's been no current exchange of value. There's been no third-party investment. A debtor reorganizes itself. It proposes its own plan without the infusion of third-party money. I stand before this Court today not having represented the debtor in the Chapter 11 proceedings. I represented the plan sponsor, the individual that put money into this program, that relied on the Chapter 11, that had his new company, the reorganized debtor, sign executory contracts with counterparties that distributed proceeds to creditors. So there's nothing in the doctrine that says it's limited. But what's the detriment suffered when your adversary did what it would seem that the doctrine requires her to do, which is applied for a stay and has taken whatever opportunities she can to have the status quo so that there aren't third parties who will suffer a detriment? I think the one thing that could have stopped the plan dead in its tracks, of course, would have been the posting of a bond. It was never offered. It was never discussed. But I don't think it's critical. I think what's critical is what happens post-confirmation. What is the harm to third parties? What is done with this plan and how is it pursued after the court approves it? Many decisions of this circuit deal with the situation, Continental's one of them, where there are very meticulous adversaries that move for a stay if anything, and the stay is denied. And the court has still concluded that it's equitably moved. And this circuit, with seven published decisions, is not some outlier on equitable mootness, which is why I also think that Judge Lamarra should be confirmed. But here's the way I'm looking at it. Seven published cases in 20 years, and, you know, I'm not a bankruptcy practitioner, never was, but from what I know. You don't want to be. I don't want to be. But the statistics that, you know, we all have available to us tell us there are thousands upon thousands of cases that go through, yet you can only look to and we can only find, you know. Continental plus seven in 20 years, that means it's rarely applied. And I know that it's applied, you know, around the country, other circuits, but I'm sure that if they did an intra-circuit analysis, it would also be rarely applied. So it sounds like what's happening here is that Judge Linares is applying it in an instance that maybe is quite distinct from what the normal application of equitable mootness doctrine would be. Judge, when I refer to seven cases, I refer to seven published decisions. My understanding is there are numerous other applications that have made its way before this court. MPOs don't matter to them. I'm pointing out that I think the doctrine is quite prevalent, alive, and brought before this circuit and others on a fairly frequent basis. But Judge Linares in his decision went through very meticulously those continental factors. He was keenly aware of how this circuit has applied the doctrine in large, complex cases, and he went factor by factor in his decision and addressed each one of them. And, in fact, addressed- But don't all five factors boil down to whether or not a stay has been imposed? If you have a- if a stay is not imposed and then the relatively lengthy process turns out, as Shakespeare referred to it, don't all those five factors emboil them to that one inquiry? I don't think so, Your Honor. I think that if you can establish, for example, lack of harm, if you can question substantial consummation of a plan, if you can offer an option to carve out some relief from the plan, and this circuit has done that in the past when dealing with professional indemnifications or challenges to attorney's fees, you can propose ways not to do violence to the plan and third parties and to seek some relief. Judge Linares addressed that issue head-on when he said that no such proposal was made. How does that- would it place any limits on the doctrine? And following on Judge Greenaway's question, isn't it going to be virtually every reorganization where there is some third-party reliance, whether it's employees or contracts that have been entered into or a plan sponsor, distributions that have been made to third parties? How do you cabinet if what we're looking at is some- is third-party injury and substantial confirmation, which just means that distributions have begun, not that they've concluded? Isn't that an incentive for the debtor to use this doctrine as a sword, not a shield, and rush to try to get substantial confirmation on the record? Judge, the best answer to that question is the doctrine's been limited and narrowed by this circuit, opinion after opinion. But in three of the seven published opinions that you referenced, and a fourth that's an NPO, this court has had to reverse because the district court applied it too broadly. Doesn't that tell us something from our own experience in trying to limit it when we've said in every presidential opinion that it's supposed to be narrow, but nearly half of those have needed to be reversed, that the district courts are not using or perhaps, given the way that the standards articulated, aren't able to apply this in a way that really respects the jurisdiction that we're obligated to exercise? And that's respectfully judged what this court does and did so in SEMCRUD because there are examples where debtors, in fact, use the doctrine as a sword and not a shield. And SEMCRUD is the primary example of that where the debtor attempted to deprive a party from having an adversary proceeding litigated and then embedded that in a plan and used the doctrine of equitable mootness to argue that that adversary proceeding should have never seen the light of day. And the Third Circuit said that was an abuse of discretion. And by the way, the $207,000 that were issued in that case on $160 million of distributable could not conceivably rise to the level of applying this narrow doctrine. And so what I think the circuit has seen is a migration from continental, which is a plan construct, equitable mootness doctrine, to debtors using it, some would argue misusing it, as a sword to shoehorn in other areas, whether it's objecting to attorney's fees, indemnification provisions. And so the circuit has narrowed it extensively. Why wasn't that the case here? Is it true that at the March 19th hearing, which was on the motion for a stay, that your client announced its intent to invoke equitable mootness? And that's before the plan even took effect, when there was litigation about a stay. Doesn't that suggest that debtors understand this to be an indication to use the doctrine as a sword at the early stages of confirmation proceedings? Judge, it was the statement of the reality. The plan is a plan of reorganization that required payments to be made. In order to extract creditor consent and approval, there are obligations under a plan, just like an ordinary contract. And so we were not misleading anyone with respect to what would take place. We were substantially consummating the plan, and a substantial consummation led to us fulfilling the requirements of equitable mootness. We were going to pursue that. Yeah, but, you know, the instance that the judge just brought up to you seems to point out that this is not an extraordinary circumstance. It almost seemed like this was going to be part of a routine strategy, and that's our concern. This part is random. Right, that, you know, a stay is coming up. Okay, it's equitable mootness time. Let's bring it out. And that's problematic. What I wanted to focus on for a moment is if you look at the development of the doctrine, I mean, it seems that as a judge-made doctrine, it was one in which a jurist said, well, we have a complex reorganization, lots of parties, lots of moving parts, lots of money going back and forth. Things are substantially on their way, hence the substantial consummation. We don't want it to get mucked up. We don't want it to get messed up. And, you know, as an equitable doctrine, we should think about equitable mootness. Here are the factors, and I agree with my colleague that, you know, it seems focused on the stay. And if the stay is in place, a lot of these other things fall into place. And in that case, how can it apply in this case? No offense to your client, seems to be a fairly routine, not a lot of money at stake. I mean, I know it's important to everybody's client, I get that. But, you know, relatively speaking, as cases go, you know, this is not, you know, the biggest case out there. I don't see how we can start the doctrine at or about Continental and work our way to this. And in both instances, it's an appropriate application of the doctrine. And so, Judge, I would say that the doctrine is equally applicable for this reason. Your Honor is suggesting that somehow, you know, a billion-dollar investment from Carl Icahn is important as opposed to. No, not Carl Icahn. But my point is that the investment and the money put at risk and the harm to parties is relative. A smaller case, and we don't hide this, it is a smaller case. A smaller case and asking creditors who are smaller creditors to disgorge their payments and asking administrative creditors to disgorge their payments and having an investor who put in money whether it was his first dollar, last dollar, big or small and have that money now at jeopardy is tied right into this doctrine. It just doesn't have the same amount of zeros. That doesn't make it any less applicable in a plan of reorganization context. It makes it less complex. It makes it less complex from the perspective of not having publicly issued securities and the level of complexity of Continental. That is true, Judge. It is less complex. We said in Nordoff v. Zenith Electronics that the doctrine should only be applied to prevent a court from unscrambling complex bankruptcy reorganizations where the appealing party should have acted before the plan became extremely difficult to retract. If this plan where there is $350,000 in assets, it is a single member LLC with 20 something employees and only about $1.3 million in terms of unsecured creditors, if this qualifies as complex, then haven't we made this exceptional doctrine the rule? Respectfully, no. I think complexity obviously is in the eye of the beholder and a Chapter 11 plan always has certain necessary ingredients and the dollars do change, but I don't believe applying this doctrine to this case opens the door for the doctrine to be applied in every other Chapter 11 plan situation. When wouldn't you apply it then? That's the next question after what the judge has just posed, right? When wouldn't you apply it? When would you say no, no, no in the 11th context? Right. I could see it, Judge, in the situation again where there is a standalone reorganization where the debtor is not bringing in outside investment and the debtor is providing payments through notes or otherwise to creditors and it's in exchange for not cash that would be the scores but other type of consideration that can be given. It's not a third party coming in and funding the exercise and making payments and entering into contracts. You could have an environment where you could carve out effective relief and the doctrine wouldn't be applicable, but to say that it only applies to a confidential, how do you define a confidential? Is it $100 million, $12 million, $8 million, $15 million? What do you do with the definition that's just been read from one of our subsequent cases? If I recall, that's a PO, as I recall. How do you drive what you've just said with what we said in that case? I mean, we're requiring a complex reorganization. You know, all disclaimers about my knowledge of bankruptcy law, but this does not sound like a complex reorganization. I think the ingredients of the reorganization plan here are akin to the ingredients of a reorganization plan in the cases like Nordhoff, like Continental, with different dollars and without publicly traded securities. The concept is the same. Reliance and detriment to those who rely in an environment where commitments are made and have to be recaptured. It's an attempt to avoid that harm. But particularly where it's here that the creditor has raised repeatedly, taken every possible step to make clear that they think there are problems on the merits of the plan, that they intend to seek a stay, that they intend to appeal. Doesn't that impact the reasonableness of reliance under those circumstances? There are open issues if there is a right to appeal a confirmation order. Unless my recollection is wrong, Your Honor, my understanding is that there was a stay applied for in Continental. I believe there was a stay applied for in Sencrude. I believe the one decision where Judge Alito concurred and didn't find that the district court abused their discretion, there wasn't a stay applied for, and he viewed that as an important factor in his concurrence. So there's nothing unique in this environment about an adversary seeking a stay and telegraphing their intention to appeal the merits of the plan. And it shouldn't change the applications of the doctrines of applicability. But if it's an equitable doctrine and the creditor has taken every opportunity to preserve its rights, how do you leave them without a remedy? You know, an appellate remedy. Even an audience, an appellate audience. That's exactly what was done in Continental. No, I understand, but we're talking about a much broader application of what's here to forbid a rarely applied doctrine. And, Judge, the rarity of its application is in the plan of reorganization setting. The problems, as I understand the circuit decisions, have been when the doctrine gets applied and tries to bring into it other extraneous, non-plan related issues where effective relief can be given. If there's a plan of reorganization and there's substantial consummation and there's reliance, then the doctrine should apply based upon Continental. And the other decisions of this circuit, which have narrowed it dramatically, this is not some runaway train. Every opportunity the circuit gets to address equitable mootness has done so to remind all parties that it's a rare doctrine to be only applied under exceptional circumstances. If this boils down to whether a stay was granted, and that's entirely in the discretion of the bankruptcy court, and it's not relevant whether a party has preserved their rights by seeking a stay, by getting notice of its objections and its intentions to the third parties relying, then haven't the federal courts completely abdicated their obligation to exercise jurisdiction to the bankruptcy court that had sole discretion about whether or not to grant a stay? How can that be constitutional? The initial stay application was presented to the bankruptcy court. There was a secondary stay application presented to an Article III court. The Article III judge reviewed the standards including likelihood of success on the merits and denied the stay in the face of an argument that this could be equitably moot, and then a preliminary injunction application was brought and also denied under the standards of a preliminary injunction. Wasn't it denied on the grounds that there wasn't jurisdiction on that interlocutory appeal? Well, I think that the circuit, actually there was an application made to the circuit where I believe the circuit referenced the lack of jurisdiction but said to the extent they had jurisdiction, they agreed with the district court's conclusion. Well, it was dismissal for lack of jurisdiction. Anything beyond that would be dictum, right? It was a minute entry after the application was made to appeal Judge Linares' denial of a stay. At my recollection, it was a minute entry signed by Judge Ambrose, which said that the Third Circuit did not have jurisdiction to review the stay denial of Judge Linares. So the stay application was presented twice and once in the form of a preliminary injunction, and it was denied. And the Judge Linares, he articulated or rather accepted, as he's obligated to do, his jurisdiction, and then on the submissions, including an unrefuted declaration, dismissed based upon equitable mootness. But contrary to the argument that somehow Stern v. Marshall is some sea change on bankruptcy court jurisdiction, there are many examples where a bankruptcy court does not have its decision reviewed. I believe in the Semkruf case, there was reference that the only known playground, and I'm sure I'm not citing it perfectly, but it was something to the effect that equitable mootness, as far as this court knows, has only one playground, and that's in bankruptcy. Well, there's a lot of big kids in that playground. Some of them include Lehman Brothers, Enron, General Motors, and Chrysler, all sales that took place and never saw Article III review. As Judge Ambrose said in Semkruf, this doctrine is tied to 363M, 364A, and the gap left by 1127B to provide the critical need of finality on commercial transactions. Can you address some of the other intervening cases that we have to deal with? Because the Supreme Court, just in the last few years, in Supreme Communications, for example, declined a younger abstention in Zivotofsky v. Clinton, declined to apply political question doctrine, and Lexmark disapproved the concept of prudential standing and required that it be tied to some constitutional or statutory interest. And the Supreme Court's also made clear in Stern and in Northern Pipeline that the jurisdiction of the bankruptcy courts as non-Article III courts is limited, and at the same time in Thomas and Schor and Northern Pipeline has emphasized that adjudication by those non-Article III courts is only constitutional because it's subject to review on appeal. So when we look at the evolution of the Supreme Court's cases and the mandate to exercise jurisdiction, including of appeals over non-Article III courts, like in RADx for Magistrates Act, for example, and our own experience with the doctrine and trying to maintain a narrow doctrine over these 18 years, which has not been successful about half of the time with the cases that have come to us, why shouldn't we reconsider the doctrine itself? Judge, with respect to Stern v. Marshall first, Stern v. Marshall is tied back into the 1982 decision of Northern Pipeline, which addressed the bankruptcy court's limited jurisdiction, and specifically in Stern v. Marshall addressed the bankruptcy court's inability to address a state cause of action asserted in a counterclaim. There is nothing in Stern v. Marshall that changes the bankruptcy court's jurisdiction except as to that particular court proceeding, which it found could not be determined without issuing proposed findings of facts and conclusions of law. Every time this circuit cites Colorado River and Quackenbush, in these equitable mootness doctrines, those decisions were known, available, abstention decisions were known, available, and addressed. As late as approximately one year ago in SEMCRUDE, this court cited to Quackenbush again, which Quackenbush came shortly after Continental, which of course cites to Colorado River and held that the doctrine was viable. The doctrine should not be revisited in the face of this court's precedent and in the face of unanimous approval in every other circuit. It fulfills a vital importance in the context of administering bankruptcy cases just as 363M does. There was nothing in Stern v. Marshall or any Supreme Court case that guts 363M, 364E, which denies Article III review of the largest commercial transactions in the world. In the world. Would you agree the statute provides for confirmation plans being subject to review by Article III courts? I do, and I think that this court said it well when it referred to 1127B and the need on a very limited basis, very limited basis, to fill that gap. But the argument that somehow every Article I decision must be reviewed by an Article III court raises concerns as to whether there are many other unconstitutional provisions within the bankruptcy code. There's a requirement when you file an appeal under 8002 that you do so within 14 days. If you miss that 14-day deadline, does Stern v. Marshall give you the opportunity to come to an Article III court and say it's unconstitutional to deprive me of my opportunity to review the merits of an Article I court? That's a different case. You said that Congress, in drafting that language, should find a jurisdiction and clearly have that authority. That's different from how we would be in 363. The fact that a 14-day period is required for taking an appeal. If that's the jurisdictional limit, then that's when the Congress is determined they can do that. I'm not here, nor would I be successful in doing it, to in any way, shape, or form convince this court that the equitable movements doctrine should be expanded. The point is that when you review the district court's decision, a detailed decision based upon a declaration that was not refuted, that I respectfully suggest you can't conclude that Judge Linares abused his discretion in following this court's precedent and the facts that were before. I'm sorry, one question. Is there any case where a court has addressed the constitutionality of the doctrine on the merits? I believe that the only reference that I've seen of late was, I believe, in the Semkruf case, there was reference to the UNR decision out of the Seventh Circuit and the conclusion that it was supported by federal common law. And again, not to be repetitive, filling in the blanks on 363M and 364E. But I would respectfully suggest, Judge Krause, that then-Judge Alito put into play, I know Chief Judge McKee was in the dissent, the constitutionality of the doctrine, when it was visited by the circuit in 1996. And that dissent has been cited, I believe, in almost every equitable mutinous case over the last 18 years. Thank you very much for your time. Thank you. Is Shelly reserved some time, I think? Reserved some time? I thought he reserved some time. He didn't, that's okay. Okay. Thank you. Shelly should be seen and not heard. Just a couple quick points. I won't take that personally. No, no, no. No. I should not have asked for the test. Judge Greenaway, you talked about the fact that there's only seven reported decisions in the circuit and that it seems like it's rarely applied. I don't, unfortunately, have the statistics, but I would submit to you that this doctrine is applied quite often in the district courts. And you probably don't see it in the plain vanilla cases such as this because creditors can't afford to appeal. It doesn't make sense to appeal. Well, there's a lot of various factors that go into whether a party takes an appeal to the Third Circuit. And in small cases, usually the committee spearheads the objections, if any, to a plan. Individual creditors do not get actively involved most of the time, and I'm just talking generally from my experience, because of the costs and things like that. And the committee is supposed to represent their interest. I happen to have a client who had a very substantial claim who is a public company. They do have the resources to pursue an appeal to the Third Circuit. But I just want to make it clear that I don't think that just because this court has not seen dismissals of plain vanilla cases on the basis of equitable mootness, that that is not going on all over this district and every other district. In fact, Judge Linares has dismissed other cases in the past based upon equitable mootness that have not come up to this level on appeal. So I don't think this is rare. I think this is becoming the rule. As far as comments about reliance and third parties. Do you believe it's been misapplied then? Excuse me? I suppose then you believe it's been misapplied. I think it's not applied the way it was meant to be applied. It's a narrow exception in very extreme circumstances where you have Lehman Brothers or reorganizations that are so complicated and so complex and involve reliance by truly third parties. We're not talking about a planned sponsor who comes in and invests. That's not a third party. This planned sponsor waived the condition precedent to finality. They assumed the rest. We're talking, I mean, third parties, when you put stock on a stock exchange and a person goes out and buys that stock, they don't know the whole dealings of the bankruptcy and then it's on appeal and such. But people coming into a company, for instance, the ordinary course, they enter into a contract with a customer. Their customers have been watching the bankruptcy throughout. They know what's going on. They're not outside third parties who have no idea what's going on. I mean, some of them in this case, unfortunately, most of their customers, they didn't give notice of the bankruptcy. They assumed they had executory contracts right through the bankruptcy case and didn't give any notice to the parties. Parties to the executive contracts and didn't schedule them. That was another issue significant that we raised on appeal. What about the Lehman Brothers contracts? Why shouldn't equitable goodness be a viable doctrine in that context? How else would you manage such a situation in the context of the Lehman Brothers? In the context of the Lehman Brothers, didn't it be a complexity issue? There needs to be a solution to that problem in that context. My position before was that there's other ways to address it. If you are going to address it to equitable goodness, then I think the test has to be refined. There has to be some more black and white lines that the courts can apply. The most significant problem with the test as it stands right now, it says, if you are going to court and you have not gotten a say, even if you sought a say, if you've been denied a say and you're seeking to overturn the confirmation order, the case is equitably moved. That's one of the biggest problems. You can't challenge a confirmation order. And that's my client's right. My client has a right to appeal the confirmation order. The plan was not confirmed. It didn't comply with the code. There's requirements. We got you there. There's ways to refine the test to make it only apply. And I know the court has been doing that, as the court mentioned, throughout these cases has been tailoring the test, but the district courts are not getting the message. Is there any problem with reverting to the way a court's power and equity has traditionally been used? That is, it's not to decline to consider the merits of a case, but in fashioning a remedy. I mean, basically what then-Judge Alito suggested in his defense was the appropriate way to consider the issue of the complexity and the difficulty with unraveling a third-party reliance. Why isn't that just something for fashioning a remedy after consideration of the merits? That's a good point, and I agree with Justice Alito. If you hear the appeal on the merits and you determine the appeal on the merits and then you look and you fashion the remedy, that's much more appropriate than just missing it out, right? And, in fact, when you review the merits, you'll have a sense of how egregious the confirmation order was. Did it not comply in a small respect with the bankruptcy code? Were there huge legal errors or small, insignificant ones, not relevant? I think that Justice Alito's approach that he articulated in Continental was the right approach. One more vote and you win a point. And I know you were on his side, unfortunately. I'm a brownstone. I'm very used to losing. But it did make sense, and I think the only counterargument to that is that if it was to use judicial resources to decide the entire merits of the appeal, then only give a very limited remedy. I think the risk in that is to ensure that if courts do consider all the merits of the appeal and they're going to limit the remedy, that they try to give as broad a remedy as possible. Are you aware of any cases, I asked your adversary, where a court has addressed the constitutional challenge to equitable mootness on the merits? Because it appears that, in terms of raising and then preserving the argument, that you and your client are the rare exception. Well, all the circuits have the equitable mootness doctrine. And recently, all the briefs that have gone up on appeal of the circuits that we've seen, there's a lot of briefs and a lot of people's challenges with constitutionality. I don't know of any circuit that has decided it yet. But it has been raised in briefs. I think we listed some in our briefs below. This issue has been raised repeatedly now, particularly in light of Stern. There have been many parties who have argued that under Stern this is not constitutional, there's no statutory authority. So it's just a matter of time before one of the circuits has decided. It's a question of which circuit is going to decide first. But I am not aware of any decision where the court has decided it in any circuit yet. Thank you very much. We'll take another brief break and then we'll do the last case. Thank you.